**FILED**

JAN 1 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**SAMUEL K. JACOBS**
   2300 M Street NW
   Suite 800
   Washington, D.C. 20037
**NANCY M. HECKERMAN**
   2300 M Street NW
   Suite 800
   Washington, D.C. 20037

     PLAINTIFFS,

v.

**THE COUNTRY KENNELS, INC.,**
Jointly and Severally,
15801 Crabbs Branch Way
Rockville, Maryland 20855-2635;
**BIOCON, INC.,** Jointly and Severally,
15801 Crabbs Branch Way
Rockville, Maryland 20855-2635;
**LAWRENCE E. CUNNICK,**
Jointly and Severally,
15801 Crabbs Branch Way
Rockville, Maryland 20855-2635;
**PAMELA NEIDERMAIR,**
Jointly and Severally,
The Country Kennels, Inc.
5718 Ridge Road
Mount Airy, Maryland 21771;
**MICHAEL T. EBAUGH,**
Jointly and Severally,
11921 Rockville Pike
Rockville, Maryland 20852-2743; and,
**DONALD R. RODGERS,**
Jointly and Severally,
11921 Rockville Pike
Rockville, Maryland 20852-2743;

     DEFENDANTS.

CASE NO: _____

CASE NUMBER 1:06CV00062

JUDGE: Rosemary M. Collyer

DECK TYPE: Pro se General Civil

DATE STAMP: 01/13/2006

JURY ACTION

**COMPLAINT FOR EXTORTION
UNDER RACKETEERING
INFLUENCED AND CORRUPT
ORGANIZATIONS ACT (RICO)**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR EXTORTION UNDER RACKETEERING

## INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

COMES NOW Samuel K. Jacobs and Nancy M. Heckerman (hereafter shall be referred to as "PLAINTIFFS") who hereby file this pleading against Lawrence Cunnick, Pamela Niedermair, Michael T. Ebaugh, Donald R. Rodgers, THE COUNTRY KENNELS, INC., and BIOCON, INC., (hereafter known as the "DEFENDANTS" or "THE COUNTRY KENNEL, INC., et al,"), and other agents, attorneys, accountants, financial consultants, or other persons or entities not so named in this Complaint for the crimes of: extortion, ransom, fraud, deception, theft by conversion, and attempted murder by severe and intentional infliction of extreme wanton, and willful negligence and emotional distress.

The actual and threatened theft, or kidnappings, of the dogs, (property and domestic pets), belonging to the Plaintiffs were committed by the Defendants who are persons, owners, employees, associates in fact, corporations, controllers, or other entities which own and operate both kennels (THE COUNTRY KENNEL, INC., etc.) to board and groom pets, and animal testing laboratory businesses (BIOCON, INC., etc.) which sell animals to other laboratories for animal testing procedures, or perform heinous testing procedures at their own laboratories.

**In London there is a statute to a little brown dog for whom the "Old Brown Dog Riots" resulted in the 1800's which stirred up trade unionists, feminists, and antivivisectionists who rioted in protest of a little brown dog who was cut up *while alive* in a British medical school. Plaintiffs fear their dogs may meet the same fate, and plead this cause to this Honorable Court to stop these overt and predicate criminal acts which are**

**being committed by these Defendants against not only the Plaintiffs animals, but other victims in the future.**

The Plaintiffs ASSERT that these crimes are irreparable, insufferable, and the Defendants' intention to sell or use the Plaintiffs' beloved kidnapped and stolen dogs for cruel and inhumane laboratory testing is illegal, immoral and abominable. Although the dogs are not human beings, they are as integral a part of the family as any other family member and if they are cruelly taken or injured the effect on each member of the family is excruciatingly painful and sadistic. Plaintiffs aver that this is a kidnapping even though the dogs are considered property.

The demands are the same as if the dogs were people: 1) there is a large amount of money demanded for their return, 2) letters to collect extensions of credit through extortionate means (ransom) have been sent, and 3) the Defendants have made their own "laws" as to the time and the (ransom) amount to be paid. Defendants are demanding money to 'supposedly' return dogs, or they have threatened verbally that the dogs will be 'disposed of' (killed), or maybe worse, used in testing laboratories.

These Defendants have *knowingly* and *intentionally* inflicted such willful and wanton acts of negligence as to severely injure the Plaintiffs which Defendants knew at all times would be the result of their criminal acts because the Plaintiffs had informed them that they suffered from the extremely fragile medical conditions of heart disease and cancer. The Defendants knew that the manner in which their crimes were executed would cause such severe mental anguish and extreme emotional distress as to be life threatening to both of the Plaintiffs.

The said criminal acts are the result of violations of: Title 7 U.S.C.A. § 2132 'Animal Welfare Act,' Title 7 U.S.C.A. § 2137 'Pet Safety and Protection Act of 2005,' and Title 15 U.S.C.A. § 1681 and § 1692, et seq., 'Consumer Credit and Protection Act.'

That the Defendants, knowing the Plaintiffs' ill health condition, cannot deny that calculatingly committed the crimes of theft and extortion with the obvious intent that the resulting impact to the Plaintiffs would create such distress that they would not physically be able to withstand the tortuous strain of these crimes and that death would result; thus, they conspired and attempted to murder the victims in violation of Title 18 U.S.C.A. § 1117 (Conspiracy to murder).

Also, the above actions cited are reliant upon the overt and predicate acts committed by Defendants (THE COUNTRY KENNEL, INC., et al) includes violations of Title 7 U.S.C.A. § 2146(c) which demands that the jurisdiction for this cause of action relies on the *"provisions of Title 18 II of the Organized Crime Control Act of 1970"* otherwise known as the Racketeering Influenced and Corrupt Organizations Act (RICO) pursuant to Title 18 U.S.C.A. § 1961 (Definitions), et seq.

All the elements of a RICO Complaint are evident in this pleading including the loss of interstate and foreign commerce due to the crimes which have been perpetrated and affected the Plaintiffs in their businesses. Any loss to a family affects the individuals from performing their daily tasks to make a living. If there is a traumatic and criminal action in addition to the loss of family members the impact is intensely magnified.

Said Complaint asserts that a complete investigation should be initiated by the Secretary of Agriculture for the Department of Agriculture of the United States since the jurisdiction for

this Complaint lies within the District of Columbia which is the location of the Office of the Secretary of Agriculture from which these Defendants were granted licenses in the name of BIOCON, INC, and other related businesses of which these Defendants are associated.

That the Plaintiffs will ask that a full investigation be started by the appropriate authorities to determine if an indictment should issue for Lawrence Cunnick and Pamela Neidermair, Michael T. Ebaugh, and Donald R. Rodgers for the conspiracy to actually make demands for the collection of extensions of credit by extortionate means, mail fraud, interference with commerce by threats or violence, engaging in monetary transactions in property derived from specified unlawful activity, and the violations of the 'Consumer Credit Protection Act,' the 'Animal Welfare Act,' and the 'Pet Safety and Protection Act of 2005.'

That any pet owner would suffer the same pain and agony that the Plaintiffs have endured if the criminal acts that these Defendants have committed had involved their pets who are an integral nexus of a huge majority of American families. But, in this particular case, a real detrimental action which affects the lives of the Plaintiffs has been executed. Therefore, the Plaintiffs have no other recourse for these truly irreparable actions but to not only file these charges to stop the murder of their pets and reclaim them for their family, but to stop this outrageous conduct from continuing and injuring other innocent and unsuspecting victims.

Plaintiffs aver generally that all conditions precedent have been performed or have occurred, and Plaintiffs state the following, to-wit:

## I. PARTIES

1.      The names and addresses of the Plaintiffs are as follows:

a. SAMUEL K. JACOBS, (hereafter known as "Jacobs"), and his address is 2300 M Street NW, Suite 800, Washington, D.C. 20037, and

b. NANCY HECKERMAN, (hereafter known as "Heckerman"),and her address is 2300 M Street NW, Suite 800, Washington, D.C. 20037.

Except where the context is otherwise indicated, reference to "Plaintiffs" refers to each of the named Plaintiffs.

2.    On information and belief, the names and addresses of the defendant corporations and individuals are as follows:

a. THE COUNTRY KENNELS, INC., Jointly and Severally, 15801 Crabbs Branch Way, Rockville, Maryland 20855-2635. This entity is a kennel which purports to be a pet friendly operation where family pets can be groomed or boarded;

b. BIOCON, INC., Jointly and Severally, 15801 Crabbs Branch Way, Rockville, Maryland 20855-2635, is an entity which purports to be a "biotech" facility which uses animals for laboratory testing and sells animals to various other testing laboratories including contracts with two U.S. Government entities named National Institute of Health (NIH), Bethesda, Maryland, and the United States Naval Medical Research Institute, Silver Spring, Maryland;

c. LAWRENCE E. CUNNICK, Jointly and Severally, 9604 Trailridge Terrace, Potomac, Maryland 20854-2801 is alleged to be the owner of THE COUNTRY KENNEL, INC., and BIOCON, INC., and other corporations not so named in this Complaint. He, in conspiracy with Pamela Neidermair and Michael Ebaugh, is the primary orchestrator of the criminal activities alleged in this Complaint;

d.   PAMELA NEIDERMAIR, Jointly and Severally, The Country Kennels, Inc., 5718 Ridge Road, Mount Airy, Maryland 21771, is the alleged manager of THE COUNTRY KENNEL, INC. and has sent two of the extortion and ransom letters to the Plaintiffs for their dogs, is responsible for any injuries or deaths of Plaintiffs' dogs since she has been the controller and conductor of many of the averred criminal acts perpetrated by the Defendants named in this Complaint;

e.   MICHAEL T. EBAUGH, Jointly and Severally, 11921 Rockville Pike, Rockville, Maryland 20852-2743 is an alleged collaborator who has joined this conspiracy and devised various devices to execute the various criminal acts of all of the Defendants including sending the latest ransom letter to the Plaintiffs, and conspiring to further expand the acts of fraud and extortion committed against the Plaintiffs; and,

f.   DONALD R. RODGERS, Jointly and Severally, 11921 Rockville Pike, Rockville, Maryland 20852-2743, is a coconspirator listed on the latest ransom letter as the partner to be constantly notified and conferred with in the planning and execution of the alleged criminal acts already committed and those which are to be planned on behalf of all of the Defendants.

## II.  JURISDICTION

3.   That jurisdiction for this Complaint lies with Title 28 U.S.C.A. § 1331 (Federal question). Plaintiffs rely upon the averred violations of the Constitution of the United States and the Laws enacted pursuant thereof entitled the United States Code.

4.   That because this Complaint is filed pursuant to averred violations of Title 7 U.S.C.A. § 2146(c). (Administration and enforcement by Secretary), the Plaintiffs are instructed by that statute to file this case pursuant to: "...*Title 18  II of the Organized Crime Control Act*

*of 1970, are made applicable to the jurisdiction, posers, and duties of the Secretary in administering and enforcing the provisions of this chapter and to any person, firm, or corporation with respect to whom such authority is exercised."* Defendant BIOCON, INC. is such a firm, or corporation, and Defendant Lawrence E. Cunnick is such a person who relies upon the issuance of licenses by the Secretary of Agriculture and, therefore, operates Defendant BIOCON, INC. pursuant to the Title 7—AGRICULTURE of the United States Code.

5.   That, therefore, the Plaintiffs further state that said Complaint shall be filed in this appropriate  United States District Court pursuant  to the jurisdiction of Title 18  U.S.C.A. § 1964 (Civil remedies) where one of the Defendants *"resides, is found, **has an agent, or transacts his affairs."*** Defendants conduct or control the affairs of Defendant entities and corporations through the licenses and authority of the Secretary of Agriculture and have contracts with United States departments or agencies which receive their authority through the Executive Branch of the United States Government which is situated in the District of Columbia.

CONSTITUTION OF THE UNITED STATES :

a.  **Article I, Section. 8. cl 1:**  *"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; . . ."* (This Clause pertains to the National Institute of Health (NIH), and the United States Naval Medical Research Institute);

b.  **Article I, Section. 8. cl. 3:**   which is commonly referred to as the Commerce Clause and which gives Congress the power *"[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."* (This Clause pertains to the Due Process Clause of the Fourteenth Amendment and is a mandatory inclusion for a claim against a State law which

Plaintiffs claim is abhorrent to the Laws of the United States and is in violation of Article II of the Constitution of the State of Maryland).

**c. Article I, Section 10. cl. 1:** *"No State shall enter into any Treaty, Alliance, or Confederation; . . . **pass any Bill of Attainder,** ex post facto Law, **or Law impairing the Obligation of Contracts,** or grant any Title of Nobility."* (This clause is mandatory when there is a State law which promotes the violation of the law of Contracts when such law conflicts with Laws of the United States).

**d. Amendment IV:** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and the persons or things to be seized."

**e. Amendment V:** " ..., *nor be deprived of life, liberty, or property, without due process of law; ... "*

**f. Amendment VIII:** *". . . nor cruel or unjust punishments inflicted"* (This Amendment pertains to State or private actions; and not only to human persons but their property as well).

**g. Amendment IX:** *"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."*

**h. Amendment XIII:** *"Neither slavery or involuntary servitude,. . . shall exist within the United States, or any place within their jurisdiction.";*

**i. Amendment XIV:** *"nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."* and the laws enacted pursuant thereof entitled: Title 18 U.S.C.A. § 1985 (Conspiracy

to interfere with civil rights) and Title 18 U.S.C.A. § 1986 (Action for neglect to prevent) *". .*

*and having power to prevent or aid in preventing. . .shall be liable to the party injured."*

     6. Under Title 7 of the United States Code—<u>AGRICULTURE</u> :

a. Title 7 U.S.C.A. § 2158. Protection of pets.

b. Title 7 U.S.C.A. § 2131. Congressional statement of policy.

c. Title 7 U.S.C.A. § 2132. Animal Welfare Act

d. Title 7 U.S.C.A. § 2133. Licensing of dealers and exhibitors.

e. Title 7 U.S.C.A. § 2135. Time period for disposal of dogs or cats by dealers or exhibitors.

f. Title 7 U.S.C.A. § 2136. Registration of research facilities, handlers, carriers and unlicensed exhibitors.

g. Title 7 U.S.C.A. § 2137. Pet Safety and Protection Act of 2005

h. Title 7 U.S.C.A. § 2140. Recordkeeping by dealers, exhibitors, research facilities, intermediate handlers, and carriers.

i. Title 7 U.S.C.A. § 2143. Standards and certification process for humane handling, care, treatment, and transportation of animals.

j. Title 7 U.S.C.A. § 2145. Consultation and cooperation with Federal, State, and local governmental bodies by Secretary of Agriculture.

k. Title 7 U.S.C.A. § 2146. Administration and enforcement by Secretary.

l. Title 7 U.S.C.A. § 2147. Inspection by legally constituted law enforcement agencies.

m. Title 7 U.S.C.A. § 2149. Violations by licensees.

n. Title 7 U.S.C.A. § 2158. Protection of pets.

7.    Under  Title  18  of  the  United  States  Code—CRIMES  AND  CRIMINAL PROCEDURES:

a.  Title 18 U.S.C.A. § 876(d). Mailing threatening communications.

b.  Title 18 U.S.C.A. § 892. Making extortionate extensions of credit.

c.  Title 18 U.S.C.A. § 893. Financing extortionate extensions of credit)

d.  Title 18 U.S.C.A. § 894. Collection of extensions of credit by extortionate means.

e.  Title 18 U.S.C.A. § 1341. Frauds and swindles

f.  Title 18 U.S.C.A. § 1343. Fraud by wire, radio, or television

g.  Title 18 U.S.C.A. § 1346 Definition of "scheme or artifice to defraud"

h.  Title 18 U.S.C.A. § 1951. Interference with  commerce by threats or violence

i.  Title 18 U.S.C.A. § 1956 Laundering of monetary instruments

j. Title 18 U.S.C.A. § 1957 Engaging in monetary transactions in property derived from specified unlawful activity,

k.  Title 18 U.S.C.A. § 1961 Definitions, "unlawful debt,"

l.  Title 18 U.S.C.A. § 1962 (a) through (d) Prohibited activities

8.  Under Title 15 United States Code—CONSUMER  CREDIT AND  PROTECTION ACT : Title 15 U.S.C.A. § 1692—(CHAPTER 41--SUBCHAPTER V--DEBT COLLECTION PRACTICES)

9.    Venue is cited pursuant to: Title 7   U.S.C.A.  § 2146(c). (Administration and enforcement by Secretary),  and Title 28 U.S.C.A. § 1391(b) and contains the clause in that statute which states: "*except as otherwise as provided by law*", which is also the criteria by which  this Complaint is filed pursuant to Title 18 U.S.C.A. § 1965 (a) (Venue and process)

which designates that a proceeding may be instituted in any court in any district (of a United States District Court) wherein a defendant *"resides, is found, has an agent, or transacts his affairs."*

10. That nothing in this Complaint can dissuade the Plaintiffs from attaching all of the Defendants' property, from being charged with the payment of the Plaintiffs' claims thereof pursuant to Title 18 U.S.C.A. § 1964 (a)[1] and (c); and that the same be declared a lien thereon for the payment of which said property may be sold.

### III.  HISTORY

11. That the Plaintiffs brought their animals: **the ROUGH COLLIES known as CHRISTIANNE, ALEXANDER, CHARLES, MAGGIE, and MOLLY; the GOLDEN RETRIEVER known as MAXWELL; and the BISHON FRISE known as JACOB,** to "THE COUNTRY KENNEL, INC. on October 11, 2005, after their house was flooded by a sewage problem caused by a sewer ejector pump, and a consequent fire which caused the house to be condemned.

12. **That these dogs are more than family companions; they have kept the Plaintiffs alive for the last eight years. Nancy M. Heckerman was diagnosed with stage III colon cancer the year that six of them was born and the mother dog never left Heckerman's side while she was recovering from six surgeries. The dogs, especially the BISHON FRISE, helps Plaintiff Jacobs to keep his heart under control by holding the dogs.** This aspect has

---

[1]  § 1964(a): The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; *or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.*  (Emphasis added).

been scientifically confirmed to the point that animals are now used in nursing homes and senior citizens centers to help the patients cope with these and other health problems including loss of family members.

13.  That for these reasons, the dogs are vital members of the family and their loss affects the Plaintiffs, and their family, not only emotionally, but physically with the separation causing dire consequences to their health. **Why else would the Plaintiffs drive two hours every week to visit the dogs, *when they were permitted* by the Defendants, and spend five figures in previous demands by the Defendants for money just for to keep these dogs alive and, purportedly, safe and healthy?** *The Defendants' actions are cold, calculated, and as noted by the animals they sell for research, the intentions are deadly.*

14.  That the Plaintiffs had previously boarded their animals for short amounts of time for several years at THE COUNTRY KENNEL, INC., and had no problems with the condition of the dogs other than they had lost weight which came back when they returned home.

15.  That when the Plaintiffs boarded the dogs at the THE COUNTRY KENNEL, INC. on October 11, 2004, they were under great stress and relied upon the personnel to take care of their animals as they had for years before during business trips which were usually for two or three months, and once for two months when Plaintiff Heckerman became ill and could not return home. The Plaintiffs never planned on the dogs being in the kennel over two or three months, but due to unforeseen complications they had to unfortunately leave the animals there until the present horrendous situation.

16.  That as the billing began to accumulate the Plaintiffs were asked to make payments which they did based not upon a written statement, but upon a verbal demand. The Plaintiffs at

all times were under the impression that they would soon have the dogs out of the kennel and into the old home which would be remodeled, or into a new home if the house could not be fixed. The determination that the house could not be fixed was not revealed until the last summer.

17.   That Plaintiffs made several payments on the account when they were asked, but on June 13, 2005, the first extortion letter demanded payment of $10,000.00  and the Plaintiffs complied because they had no where else to take all of the dogs in the middle of the summer when the kennels are full.

18.   That Plaintiffs state that no one pays the amount of money demanded by these Defendants unless the dogs were important to the Plaintiffs' family. The Defendants knew that the bills would be paid if they submitted the statements, but this was not in their program. The Defendants' intention is to extort as much money as possible, and then, sell the dogs by concocting a giant ruse of fraud and deception.

19.   That at that time the Plaintiffs visited the offices of Lawrence Cunnick, the owner of THE COUNTRY KENNEL, INC. at 15801 Crabbs Branch Way, Rockville, Maryland 20855, and **discovered that he also owned a research facility named BIOCON which used live and dead animals for research trials. In the offices were numerous books and periodicals on the testing of animals and the disposing of dead test animals.** The Plaintiffs were in shock that the two companies were commingled under one roof. One company to pamper animals, and the other company to kill animals.

20.   That because it was difficult in the summer to find another kennel to board the animals since most vacations were at that time, the Plaintiffs left their beloved animals there with

the intention that they were moving into their house very soon. The contract agreement for the house fell through and the Plaintiffs started their search for another property.

21.    That at all times the Plaintiffs had every intention of paying all of their bills and bringing them home when the housing problems were settled. Plaintiffs constantly asked for the statements when they personally visited the dogs which was usually every Saturday throughout the spring, summer, autumn, and winter when Defendants allowed the visits. The Plaintiffs were discouraged from visiting the dogs during inclement weather since there were no inside facilities for them to visit the dogs without disrupting the other dogs being boarded.

22.    That sometime in late October or November, 2005, another demand for $12,000.00 was verbally made with the condition that at least $6,000.00 be paid, but no date was given as well as no statement.  At same time, the personnel at the kennel demanded that the dogs' rabies and other shots be given so the Plaintiffs made arrangements on November 14, 2005, that the shots be given at a local veterinarian in Mount Airy, Maryland who was the choice of THE COUNTRY KENNEL, INC.

23.    That during this time Plaintiffs on at least eight occasions either called and left messages with the receptionist at 15801 Crabbs Branch Way, Rockville, Maryland, or hand delivered letters addressed to Lawrence Cunnick at his offices at THE COUNTRY KENNEL, INC. and BIOCON, INC. only to be told that he would was not available, was at another facility somewhere in the Washington, D.C. areas, or would not see the Plaintiffs. Defendant Cunnick did not respond to the letters or return the telephone calls either in writing or verbally.

24.    That at no time during the dogs unfortunate incarceration did the Plaintiffs receive even one statement in person or through the mail about the billing although they were called and

told that they would be mailed a statement for their review. This statement was never received by mail or in person. Always the Plaintiffs were told that they would receive the billing "next time." The last letter was delivered to Lawrence Cunnick on December 16, 2005, asking him to please call the Plaintiffs and make an appointment to see them.

25. On December 6, 2005, the first, and only, letter about this recent demand for money from THE COUNTRY KENNEL, INC., et al, was mailed to the Plaintiffs' mailing address which is private post office box demanding the amount of $18,720.00 by December 15, 2005. the letter demanded money for the dogs with no explanation as to the charges, a statement as to justification of the amount owed on the account, and no referral to any other communication concerning the dogs. The letter further demanded that the amount be received by December 15, 2005, or the dogs would be taken as "property" of THE COUNTRY KENNEL, INC. the Plaintiffs received the letter at 5:25 P.M. on December 17, 2005.

26. That Plaintiff Heckerman immediately called Defendant Pamela Neidermair and left a message for her to return her telephone calls which she has never done. Defendant Lawrence Cunnick has never returned any telephone calls, or sent any written messages.

27. That a third ransom letter, or extortion letter, was sent to the Plaintiffs by Defendants Michael Ebaugh and Donald R. Rodgers on January 5, 2006, with yet another deadline to perform or the (kidnapped) animals would be sold according to some archaic and unconstitutional State law which violates not only the Constitution of the United States but the constitution of the State of Maryland.

28. That these three explicit letters to the Plaintiffs from the Defendants demanded the collection of an extension of credit through extortionate means. Said extortion letters and the acts

which were committed to initiate these threats have caused such cruel and unusual punishments and suffering to the Plaintiffs that emotional and mental injuries or damages have evolved as a result of these crimes.

## IV. STATEMENT OF FACT

29. That pursuant to Title 18 U.S.C.A. § 1964 (c)(Civil remedies) any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, . . . ." The Plaintiffs in this cause state that this condition has occurred through the violations of the laws aforementioned and detailed herein.

**A. False accusations of abandonment:**

30. That the Plaintiffs were mailed a letter demanding a collection of an extension of credit through extortionate means[2] on June 13, 2005, (See 'Exhibit A'). (A copy of the letter dated June 13, 2005, is attached to this Complaint as 'Exhibit A' and incorporated by reference herein). Out of fear that the animals would be harmed, the Plaintiffs paid the $10,000.00 in the form of a $2,000.00 personal check on June 30, 2005, and a $8,000.00 Official Check on July 20, 2005. the copies of these two checks are attached as 'Exhibit B.' (A copy of the Personal Check and the Official Check are attached to this Complaint as 'Exhibit B' and incorporated by reference herein.).

---

[2] Title 18 U.S.C.A. § 891. Definitions and rules of construction(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

31. That although the Plaintiffs were promised a detailed statement by Defendants, the fact that no statement was forth coming demonstrates that the Defendants had the intention to attempt the extortion demand again, and thus, the second letter supplied the continuity element.

32. These predicate acts formed an enterprise to extort funds and collect an unlawful debt in violation of Title 18 U.S.C.A. § 1963(c) pursuant to Title 18 U.S.C.A. § 1951 (Interference with commerce, robbery, or extortion); § 1952 (Racketeering); and, Title 18 U.S.C.A. §1956 (c) (Laundering of monetary instruments).[3]

33. That Plaintiffs allege that the actions of the Defendants were induced by economic as well as other motives or actions. The intentional actions were meant to inflict distress upon the Plaintiffs by conspiring to threaten them with the fear that the dogs would be destroyed.

34. That the third letter sent by the Defendant Michael T. Ebaugh and Donald R. Rodgers is a complete fabrication which states that the Defendants THE COUNTRY KENNEL, INC., asked the Plaintiffs to *"reclaim possession of the dogs."* Defendant Pamela Neidermair and her employees repeatedly told the Plaintiffs that they could not remove the animals until the bill was settled yet never presented a bill. Even the letter dated January 5, 2006, states that the Defendant's office had been retained *"to arrange for the delivery of Alex, Charlie, Christianne, Jake, Maggie, Max and Mollie (collectively, the "Dogs"),"* but fails to state the amount due to "collect" them or gives a statement.

---

[3] Title 18 U.S.C.A. §1956(1)the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7).

35. That since the letters were sent three times the Plaintiffs assert that this specific threat of repetition extends indefinitely into the future, and thus, the requisite threat of continuity is supplied.

36. That the dogs needed their rabies and other shots and although they had not been permitted to leave with the dogs before except once when two dogs were ill, Defendant Pamela Neidermair gave permission to the Plaintiffs to take the dogs for their shots. Maxwell and Alex had their shots when they were taken for their sick visits on April 19, 2005.

37. That the other five dogs were taken to the Mount Airy Veterinary Associates, 1312 South Main Street, Ste 9, Mount Airy, Maryland, 21771, on November 14, 2005, for their shots. Plaintiff Heckerman and a friend took three dogs for the first appointment, returned the three dogs, and then took the other two. Plaintiff Heckerman registered all of the dogs in her name, or her husband's name and paid for the dogs' shots and exams.

38. That the fact that the Plaintiffs took the dogs for their shots, registered the dogs under their name with the veterinarian, and paid for the shots and exams on April 19, 2005 and November 14, 2005, also confirms that the Plaintiffs *had no intention of abandoning the dogs. The Plaintiffs have always had the objective to retrieve their dogs as soon as the housing problem was resolved and never would have left them with the kennel this long if there had not been a disaster which occurred which was beyond their control.*

39. **That the Plaintiffs had no intention of abandoning the dogs at any time, nor did they have plans in the future. Any statements made by the Defendants to the contrary are spurious, and an unconscionable fallacy.**

40.   That Plaintiffs Jacobs and Heckerman allege that these are schemes calculated to deceive persons of ordinary prudence and comprehension. Every pattern of racketeering activity which is described in this Complaint contained a deceptive scheme for which the Plaintiffs were the *"intended victims"* of the Defendants. At the point where the Plaintiffs were actually defrauded and tricked by the pattern of racketeering activities the Plaintiffs then became the *"actual victims"* of the Defendants. Thus, The Plaintiffs were the *intended* and *actual victims* of the direct and indirect predicate acts of the Defendants' enterprises.

## B. Violations of the 'CONSUMER CREDIT PROTECTION ACT':

**NOTE:** *If it please the Honorable Court, Plaintiffs are enumerating the Consumer Credit Protection Act laws in detail not to insult the Court, but since none of the Defendants appear to have knowledge of these Federal statutes since they have failed to adhere to any of them.*

### a. Failure of Defendants to respond to demands for accounting procedures.

41.   That the Defendants have violated the Consumer Protection Act by not fulfilling and submitting the requested written documentation for the charges and fees demanded after repeated requests and multiple visits in person to obtain these documents.

42.   That since the Defendants not only have failed to submit these written documents of billing, and have changed the amounts verbally on each visit without justification or rationale, they have violated the **CONSUMER CREDIT PROTECTION ACT (15 U.S.C.1601 et seq.)** And at the end thereof the following new title: TITLE   VIII—DEBT   COLLECTION PRACTICES ACT, and may be cited as 'Fair Debt Collection Practices Act' and 'Truth in Lending Act.' [4]

---

[4] **Title 15  U.S.C.A. §  1692f. Unfair practices**

43. That the Defendants' failure to submit, mail or respond to the request for a justified statement implied that the Defendants intended to make a direct attack against the Plaintiffs personally knowing the health conditions of the Plaintiffs, especially the nine by-pass surgery patient Samuel K. Jacobs. The Defendants willfully, wantonly and intentionally inflicted this emotional distress upon the Plaintiffs through the failure to adhere to the Federal statutes pertaining to the Consumer Credit Protection Act

44. That the Defendants wrote not one but three letters in violation of Title 18 U.S.C.A. § 1341 (Frauds and swindles) with a threatened criminal intent to harm and injure the Plaintiffs through mental torture and anguish through the kidnapping and threatened harm to the Plaintiffs' dogs if an extortionate extension of credit demand was not met.

45. That these Defendants committed these criminally overt and predicate acts through mail fraud in violation of Title 18 U.S.C.A. § 1341 (Frauds and swindles) and Title 15

---

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

    (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

    (B) there is no present intention to take possession of the property; or

   (C) the property is exempt by law from such dispossession or disablement.

U.S.C.A. § 1692d. (Harassment or abuse)[5] in conjunction with Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence).

46.    That Pamela Neidermair, or her associates have threatened the Plaintiffs by knowingly withholding information by not responding to their telephone calls when the Plaintiffs called about the statements for the dogs, and yet they were always aware of the correct mailing address and the telephone numbers.[6] The Plaintiffs can verify their telephone calls through their billing records.

---

[5] **CONSUMER CREDIT PROTECTION ACT. Title 15 U.S.C.A. § 1692d. Harassment or abuse.**
   A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the debt of collection. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
   (1)  **The use or threat of violence or other criminal means to harm the physical person, reputation, or property of any person.**
   (3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 603(f) or 604(3) of this act.
**Title 15 U.S.C.A. § 1692e. False or misleading representations**
   A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
   (2) The false representation of –
      (A) the character, amount, or legal status of any debt; or
      (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
   (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.
   (8) Communicating or threatening to communicated to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.
   (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.
   (11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.
   (12) The false representation or implication that accounts have been turned over to innocent purchasers for value.
[6] **CONTACT WITH A THIRD PARTY**

## C. Fraudulent attempts to obtain privileged information through other parties.

### a. A "friend" at the Sandy Spring Bank:

47.  That in July, 2005, when the Plaintiffs met with the Defendant Lawrence Cunnick at

his office at 15801 Crabbs Branch Way, Rockville, Maryland, after the first extortionate demand

letter was sent by Defendant Pamela Neidermair on June 13, 2005. Defendant Lawrence E.

Cunnick  announced that he knew how much money was in the Plaintiffs' banking account at

Sandy Spring Bank, 17801 Georgia Avenue, Olney, Maryland 20832, because he had a good

friend who was one of the Directors of the bank.

48.  That Defendant Lawrence E. Cunnick  stated to the Plaintiffs that he knew that they

received large sums of money   on a irregular basis  because his friend at the bank had told him

of the deposits and transfers, and that the account was used primarily to pay bills.  He even

suggested that he could introduce the Plaintiffs to a financial advisor to help them. The request

for the $10,000.00 in July, 2005 was not coincidental. A personal check was given on June 30,

2005 for $2,000.00 to the Defendants. When Plaintiff Nancy M. Heckerman delivered the

Official Check for $8,000.00 to Lawrence Cunnick on July 20, 2005, he already knew that the

deposit had been made in the Plaintiffs' account because his "friend" told him.

---

The Fair Debt Collection Practices Act prohibits contact with third parties concerning the debt of a consumer (except for location information). This restriction covers contact with the mother or children of the consumer, any close relatives, and also includes contact with an employer, neighbor, or third party. Contacting a neighbor for the sole purpose of leaving a message for the debtor where the creditor has full knowledge of the telephone number of the consumer may constitute harassment since the creditor should have contacted the consumer in the first place. Any statement of a disparaging or derogatory nature to a third party constitutes harassment and advising any third party that the consumer  has no money, is dishonest, or has a criminal record, is also harassment.

Probably the most dangerous of all contacts is with the employer of the debtor, Contacting the debtor's employer for the purpose of obtaining assistance from the employer in collecting the debt is "per se" a violation of the Fair Debt Collection Practices Act. Any type of contact with the employer is dangerous, for the debtor is now in a position to blame the creditor for any failure encountered in progress or promotion on the job.

49.   That it is unscrupulous for a director of a bank to obtain confidential information about a customer's account and relate the status of the account to another person who is not on the account. The Plaintiffs have not deposited any really large sums of money in that bank after Defendant Lawrence Cunnick revealed the source of his information.

50.   That the Plaintiffs and Defendant Cunnick met at THE COUNTRY KENNEL, INC. one day and Cunnick asked the Plaintiffs if they knew the bank director's name but at the time Cunnick did not reveal that he had information about the Plaintiffs' account. Officers at the bank can be deposed about this source. Again, this is a violation of Title 15 U.S.C.A. § 1692e.(10) False or misleading representations. (See 'footnote 3').

**b.** *A meeting with a "financial planner" at Ameriprise Financial Service:*

51.   That THE COUNTRY KENNEL, INC. manager, Defendant Pamela Neidermair, even urged a meeting for Samuel K. Jacobs and Nancy M. Heckerman and gave them a card of her son, Jason Aud, who is a financial investment counselor for Ameriprise Financial Service, at 10500 Little Patuxent Pkwy, Ste 300, Columbia, MD 21044, which is a division of The American Express Company, Inc.

52.   That Defendant Pamela Neidermair repeatedly asked if the Plaintiffs had called her son when they came to see their dogs. Defendant Pamela Neidermair pushed her son's expertise upon the Plaintiffs in order to extract information through him exactly how much money could be claimed through fraud by the Defendants. This action by Defendant Pamela Neidermair involves an investment company in a conspiracy to defraud a consumer in violation of Title 18 U.S.C.A. § 225 (Continuing financial crimes enterprises).

53. That the plans for the kidnapping, extortion, and ransom notes were in part the result of the Defendants' actual and attempted invasion into the privacy of the Plaintiffs' personal financial affairs in order to determine exactly when to demand the ransom for the dogs. Very little money had been put into the accounts at Sandy Spring Bank since the Plaintiffs discovered that their accounts were being "monitored" and the information passed along to Defendant Lawernce E. Cunnick.

**C. Collection of extensions of credit through extortion, conspiracy, and fraud.**

54. That the Defendants, knowing that the Christmas rush would delay the mail being delivered in a timely fashioned to the Plaintiffs, orchestrated the kidnapping of the dogs and the attempt to collect an extension of credit through extortion through theft by conversion to coincide with the holiday and sent the second letter on December 6, 2005, demanding payment in less than nine days.

55. That the investigators that the Plaintiffs hired after the ransom note arrived discovered that the Defendants orchestrated the kidnapping and extortion demand since they knew that the letter would be delayed with the Christmas rush and the Plaintiffs could not meet the demands by the time the Defendants erroneously specified. Defendants knew that they would have the stolen dogs and intend to sell the pure bred unaltered male dogs for a high price which they would never reveal to the Plaintiffs, and that the rest of the dogs which are neutered, and older, would be sold to other testing laboratories or used by BIOCON, INC.

56. _That the Defendants did not ever send the statements by mail, refused to give_ _the statements in person, and contrived this extortionate demand for a usurious amount_ _because they do not really want the Plaintiffs to retrieve their dogs._ *The Defendants can*

*sell the Plaintiffs' animals to testing laboratories and the three purebred male dogs ( two*

*ROUGH COLLIES and one GOLDEN RETRIEVER) who are not neutered for more than the*

*extortionate amount that they have demanded in their ransom letters to the Plaintiffs.*

**D.  Failure to adhere to Title 15  U.S.C.A. § 1692g. Unfair practice:**

57.  That pursuant to Title 18  U.S.C.A. § 1692g. Unfair practices,[7] Lawrence Cunnick

and Pamela Neidermair  also had no right to demand  any funds without adhering to the Federal

statute for the time to communicate and acknowledge the dispute of the debt. Surprisingly,

Defendant Michael T. Ebaugh and Donald R. Rodgers have ignored the Federal laws and made

---

[7] **Title 18  U.S.C.A. § 1692g. Validation of debts**
(a) Notice of debt; contents
   Within five days after the initial communication with a consumer in connection with the collection of
any debt, a debt collector shall, unless the following information is contained in the initial communication
or the consumer has paid the debt, send the consumer a written notice containing--
      (1) the amount of the debt;
      (2) the name of the creditor to whom the debt is owed;
      (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the
      validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt
      collector;
       (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period
      that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the
      debt or a copy of a judgment against the consumer and a copy of such verification or judgment will
      be mailed to the consumer by the debt collector; and
       (5) a statement that, upon the consumer's written request within the thirty-day period, the debt
      collector will provide the consumer with the name and address of the original creditor, if different
      from the current creditor.
(b) Disputed debts
   If the consumer notifies the debt collector in writing within the thirty-day period described in
subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer
requests the name and address of the original creditor, the debt collector shall cease collection of the debt,
or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a
judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or
name and address of the original creditor, is mailed to the consumer by the debt collector.
(c) Admission of liability
   The failure of a consumer to dispute the validity of a debt under
this section may not be construed by any court as an admission of
liability by the consumer.

up their own laws to suit the Defendants' agenda. Plaintiffs charge them with knowingly attempting to defraud the Plaintiffs to collect this usurious and extortionate extension of credit in violation of Title 18 U.S.C.A. § 892 (Making extortionate extensions of credit), Title 18 U.S.C.A. § 893 (Financing extortionate extensions of credit), and Title 18 U.S.C.A. § 894. (Collection of extensions of credit).

58.   That Plaintiffs will file a complaint to the local and national boards of professional responsibility that Defendants Michael T. Ebaugh and Donald R. Rodgers, as debt collectors, have violated the laws of the United States by attempting to mislead and defraud the Plaintiffs by writing a bogus letter which are nefarious fabrication.

59.   That Defendants' lack of justification for the debt leads the observer to believe that the debt is false and fraudulent. Any reputable creditor would have been sending the statements on a regular basis long before now, would have clarified any discrepancies, and never, never, have written an extortion (ransom) letter. The Defendants failed to:

1) send the Plaintiffs an initial communication as to the debt and the exact amounts;

2) state the exact charges for the services for each animal;

3) to adhere to the Federal laws and made up their own laws as to the time frame for the communications for the debt; and

4) to acknowledge the fact that the Plaintiffs dispute the amount of the debt.

60.   That the Defendants can not make up their own law that is less than the actual time to respond, or put their head in sand like an ostrich that the debt is not disputed and continue in their theft by conversion in violation of Title 18 U.S.C.A. § 1341 (Frauds and swindles).

60. That the Defendants made verbal demands for payment after the money was paid for the first extortionate request, and after the payment the Plaintiffs demanded some written receipt or verification of the multiple payments that Plaintiffs have made in the past twelve months. No written documentation as to the amount charged for each dog, no incidental charges has ever been forthcoming and summarized except for one in January, 2005, which stated that the balance was zero for the account which are included in 'Exhibit C.' ( A copy of most of the payments made by the Plaintiffs which were made in 2005 are attached as 'Exhibit C' and incorporated by reference herein.)

61. That this billing irregularity denotes a form of a usurious rate charges by hiding this information from the consumer in violation of Title 18 U.S.C.A. § 892 (Making extortionate extensions of credit)(b)(2)[8] in conjunction with Title 18 U.S.C.A. § 1961 (6)(Definitions):

> *"unlawful debt" means a debt (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, **or** the business of lending money or a thing of a value at rate usurious under State or Federal law, where the usurious rate is at least twice enforceable rate.*

## V. BIOCON, INC. AND VIOLATIONS OF THE 'ANIMAL WELFARE ACT' AND

## THE 'PET SAFETY AND PROTECTION ACT OF 2005'

62. That the Plaintiffs assert that if the Defendants are attempting to procure test animals from the Plaintiffs in such a devious and unethical manner, there is reason to believe that this is the way that other test animals are being procured for BIOCON, INC.

---

[8] Congressional Findings and Declaration of Purpose: Section 201 of Pub.L. 90-321 provided that:
(3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce.

63. That as soon as Plaintiffs paid one bill, another verbal request was being made for another payment, but never an exact final amount. This has kept the Plaintiffs from ever being able to have their animals released since the Defendants refused to release the animals until the total bill was paid. This is not taking care of the animals in a humane way pursuant to Title 7 U.S.C.A., it is a pure form of extortion, theft, fraud, and kidnapping in violation of Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence).

64. That since these Defendants THE COUNTRY KENNEL, INC., BIOCON, INC., Lawrence E. Cunnick, and Pamela Neidermair are all coconspirators in various enterprises designed to buy and sell animals for research testing, and death, they are all under the same jurisdiction of the laws of the United States concerning Agriculture. Therefore, all violations are under Federal laws and Federal jurisdiction.[9] The Defendants have been awarded contracts to sell

---

[9] **Title 7 U.S.C.A. § 2132 (Animal Welfare Act).**
(a) *"The term "person" includes any individual, partnership, firm, joint stock company, corporation, association, trust, estate, or other legal entity;"*
(f) *the term "dealer" means any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet, or (2) any dog for hunting, security, or breeding purposes, except that this term does not include –*
    *(i) a retail pet store except such store which sells any animals to a research facility, an exhibitor, or a dealer; or*
    *(ii) any person who does not sell, or negotiate the purchase or sale of any wild animal, dog, or cat, and who derives no more than $500 gross income from the sale of other animals during any calendar year;"*
    *(g) "The term "animal" means any live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or such other warmblooded animal, as the Secretary may determine is being used, or is intended for use, for research, testing, experimentation, or exhibition purposes, or as a pet; . With respect to a dog, the term means all dogs including those used for hunting, security, or breeding purposes;"*
    *(i) "The term "intermediate handler" means any person including a department, agency, or instrumentality or the United States or of any State or local government (other than a dealer, research facility, or exhibitor, an operator of an auction sale, or a carrier) who is engaged in any business in which he receives custody of animals in connection with their transportation in commerce;"*
    *(j) "The term "Federal agency" means an Executive agency as such term is defined in section 105 of title 5, and with respect to any research facility means the agency from which the research facility*

animals and list as two of their clients: the National Institute of Health (NIH), Bethesda,

Maryland, and the United States Naval Medical Research Institute, Silver Spring, Maryland.

This is *not* a State case.[10]

---

*receives a Federal award for the conduct of research, experimentation, or testing, involving the use of animals;"*

(l) *"The term "Federal award for the conduct of research, experimentation, or testing, involving the use of animals" means any mechanism (including a grant, award, loan, contract, or cooperative agreement) under which Federal funds are provided to support the conduct of such research."*

[10] **Title 7 U.S.C.A. § 2146. Administration and enforcement by Secretary.**

*(a) Investigations and inspections*

*The Secretary shall make such investigations or inspections as he deems necessary to determine whether any dealer, exhibitor, intermediate handler, carrier, research facility, or operator of an auction sale subject to section 2142 of this title, has violated or is violating any provision of this chapter or any regulation or standard issued thereunder, and for such purposes, the Secretary shall, at all reasonable times, have access to the places of business and facilities, animals, and those records required to be kept pursuant to section 2140 of this title of any such dealer, exhibitor, intermediate handler, carrier, research facility, or operator of an auction sale. . .*

*(b) Penalties for interfering with official duties*

*Any person who forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person while engaged in or on account of the performance of his official duties under this chapter shall be fined not more than $5,000, or imprisoned not more than three years, or both. Whoever, in the commission of such acts, uses a deadly or dangerous weapon shall be fined not more than $10,000, or imprisoned not more than ten years, or both. Whoever kills any person while engaged in or on account of the performance of his official duties under this chapter shall be punished as provided under sections 1111 and 1114 of title 18.*

*(c) Procedures*

For the efficient administration and enforcement of this chapter and the regulations and standards promulgated under this chapter, the provisions (including penalties) of sections 46, 48, 49 and 50 of title 15 (except paragraph (c) through (h) of section 46 and the last paragraph of section 49(11) of title 15), and **the provisions of Title 18 II of the Organized Crime Control Act of 1970, are made applicable to the jurisdiction, posers, and duties of the Secretary in administering and enforcing the provisions of this chapter and to any person, firm, or corporation with respect to whom such authority is exercised. The Secretary may prosecute any inquiry necessary to his duties under this chapter in any part of the United States, including any territory, or possession thereof, the District of Columbia, or the Commonwealth of Puerto Rico. The powers conferred by said sections 49 and 50 of title 15 on the district courts of the United States may exercised for the purposes of this chapter by any district court of the United States.** The United States district courts, the District Court of Guam, the District Court of the Virgin Islands, the highest court of American Samoa, and the United States courts of the other territories, are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter, and shall have jurisdiction in all other kinds of cases arising under this chapter, except as provided in section 2149(c) of this title."

65.    That Plaintiffs question whether THE COUNTRY KENNEL, INC., et al, is registered with the Secretary of Agriculture as a *"every intermediate handler, every carrier, and every exhibitor. . ."* [11] with its conspirator entity BIOCON, INC.

66.    That the Defendants made sure that the Plaintiffs had all of the animals' shots administered before the Defendants sold of are disposed of the animals. But the Plaintiffs paid for the shots and exams for their animals and are listed as the owners less than a month before the letter was written by the Defendants who now claim the dogs as the "property" of THE COUNTRY KENNEL, INC., et al. Therefore, there was no waiting period of thirty days, much less 1 year, before the Defendants illegally claimed the stolen animals as their "property."

67.    That this criminal act is in violation of **Title 7   U.S.C.A.  § 2131. Congressional statement of policy.**  (3) *"to protect the owners of animals from the theft of their animals by preventing the sale or use of animals which have been stolen."*

68.    That the Plaintiffs maintain that their dogs were not acquired by the Defendants pursuant to Title 7   U.S.C.A. § 2137. (Pet Safety and Protection Act of 2005). [12] ("it is now

---

[11] **Title 7   U.S.C.A.  §  2136. Registration of research facilities, handlers, carriers and unlicensed exhibitors.** "Every research facility, every intermediate handler, every carrier, and every exhibitor not licensed under section 2133 of this title shall register with the Secretary in accordance with such rules and regulations as he may prescribe."

[12] **Title 7   U.S.C.A. § 2137. (Pet Safety and Protection Act of 2005). Purchase of dogs or cats by research facilities prohibited except from authorized operators of auction sales and licensed dealers or exhibitors.** *"It shall be unlawful for any research facility to purchase any dog or cat from any person except an operator of an auction sale subject to section 2142 of this title or a person holding a valid license as a dealer or exhibitor issued by the Secretary pursuant to this chapter unless such person is exempted from obtaining such license under section 2133 of this title."*

*(a) Definition of Person- In this section, the term 'person' means any individual partnership, firm, joint stock company, corporation, association, trust, estate, pound, shelter, or other legal entity.*

***(b) Use of Dogs and Cats- No research facility or Federal research facility may use a dog or cat for research or educations purposes if the dog or cat was obtained from a person other than a person described in subsection (d).***

generally recognized that legislation which has for its purpose the protection of animals from

harassment and ill-treatment is a valid exercise of the police power.") *C.E. America, Inc. v.*

*Antorini,* 210 So.2d 443, 444 (Fla. 1968).

69. That Plaintiffs will depose Dr. Alan C. Stader, VMD, of the Mount Airy Veterinary

Associates, 1312 South Main Street, Ste 9, Mount Airy, MD 21771, to testify about the medical

procedures for the animals and to substantiate the Plaintiffs' claims as to the time periods.

70. That upon visits by the Plaintiffs in the past months to the offices of Lawrence

Cunnick, it was observed that his BIOCON business benefits from the use of animals for

laboratory testing for various scientific projects. There are numerous books and other written

nomenclature attesting to the procedures for the testing of animals for these laboratory

procedures which are in several rooms of his offices. At the time of these visits, the Plaintiffs

noted these books and inquired how Lawrence Cunnick could own a laboratory for animal

---

*(c) Selling, Donation or Offering Dogs and Cats- No person, other than a person described in subsection (d), may sell, donate, or offer a dog or cat to any research facility or Federal research facility.*

*(d) Permissible Sources- A person from whom a research facility, or a Federal research facility may obtain a dog or cat for research or educational purposes under subsection (b), **and a person who may sell, donate, or offer a dog or cat to a research facility or a Federal research facility under subsection (c), shall be—***

    *(1) a dealer licensed under section 3 that has bred and raised the dog or cat;*
    *(2) a publicly owned and operated pound or shelter that—*
        *(A) is registered with the Secretary;*
        *(B) is in compliance with section 28(a)(1)and with the requirements for dealers in subsections (b) and (c) of section 28; and*
        *(C) obtained the dog or cat from its legal owner, other than a pound or shelter;*
    *(3)a person that is donating the dog or cat and that—*
        *(A) bred and raised the dog or cat; or*
        *(B) owned the dog or cat for not less than 1 year immediately preceding the donation;*
*(e) Penalties-*
    *(1) IN GENERAL- A person that violates this section shall be fined $1,000 for each violation.*
    *(2) ADDITIONAL PENALTY- A penalty under this subsection shall be in addition to any other applicable penalty.*

testing, and a kennel which supposedly cared for, groomed, and pampered the pets of the consumer public.

71.    That the conference room and other offices verifies that THE COUNTRY KENNEL, INC., et al, and BIOCON, INC., et al, both being at the same address, sharing the same offices and facilities shows that the two companies are commingled, and the actions of one entity are the result of the actions of the other entity.

> . . .*due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds. As the Tenth Circuit noted, to rule otherwise would defeat the very purpose of the money laundering statutes. It is unnecessary to attempt to segregate in some manner the tainted funds from the commingled account.*[13]

72. That the Plaintiffs state that since the charges have never been completely submitted, the bill could not be paid, and the Plaintiffs state that this was a ploy to obtain the dogs for the experimentation of Lawrence Cunnick's laboratory testing facility or to sell to other laboratories, specifically those Federal research facilities of the National Institute of Health (NIH), Bethesda, Maryland, and the Department of the Navy, Naval Medical Research Institute, Silver Spring, Maryland.[14]

---

[13] *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994), cert. Denied, 115 S.Ct. 1699 (1995). See also, *United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996) (follows *Garcia*).

[14] **Title 7 U.S.C.A. § 2140. Recordkeeping by dealers, exhibitors, research facilities, intermediate handlers, and carriers.** "Dealers and exhibitors shall make and retain for such reasonable period of time as the Secretary may prescribe, such records with respect to the purchase, sale, transportation, identification, and previous ownership of animals as the Secretary may prescribe. Research facilities shall make and retain such records only with respect to the purchase, sale, transportation, identification, and previous ownership of animals as the Secretary may prescribe. Research facilities shall make and retain such records only with respect to the purchase, sale, transportation, identification, and previous ownership of live dogs and cats. At the request of the Secretary, any regulatory agency of the Federal Government which requires records to be maintained by intermediate handlers and carriers with respect to the transportation, receiving, handling, and delivery of animals on forms prescribed by the agency, shall require there to be included in such forms, and intermediate handlers and carriers shall include in such forms, such information as the Secretary may require for the effective administration of this chapter. Such

73.   **That it does not matter if the Plaintiffs' animals were used without their permission in the long range scope of this investigation; what matters is that two companies, foreign to each other in purpose, have been financially and physically commingled to commit acts of violence against the consumers and the United States since if the Defendants are found guilty of violating even ONE LAW of the United States, then they are capable of breaking all laws of the United research  facilities of the United States, or privately to other parties, for a profit.** [15]

74.   That the Plaintiffs assert that ALL CONTRACTS awarded to any of these entities should be cancelled at once pending a full investigation of these facilities and their abhorrent practices of fraud, theft, and deceit.

75.   That the Plaintiffs demand an immediate inspection authorized by the Secretary pursuant to Title 7  U.S.C.A. § 2147. Inspection by legally constituted law enforcement agencies:

> "The Secretary shall promulgate rules and regulations requiring dealers, exhibitors, research facilities, and operators of auction sales subject to section 2142 of this title to permit inspection of their animals and records at reasonable hours upon request by legally constituted law enforcement agencies in search of lost animals."

---

information shall be retained for such reasonable period of time as the Secretary may prescribe. If regulatory agencies of the Federal Government do not prescribe requirements  for any such forms, intermediate handlers and carriers shall make and retain for such reasonable period as the Secretary may prescribe such records with respect tot eh transportation, receiving, handling, and delivery of animals as the Secretary may prescribe. Such records shall be made available at all reasonable times for inspection and copying by the Secretary."

[15] **Title 7 U.S.C.A. § 2139. Principal-agent relationship established.** "When construing or enforcing the provisions of this chapter, the act, omission, or failure of any person acting for or  employed by a research facility, a dealer, or an exhibitor or a person licensed as a dealer or an exhibitor pursuant to the second sentence of section 2133 of this title, or an operator of an auction sale subject to section 2142 of this title, or an intermediate handler, or a carrier, within the scope of his employment or office, shall be deemed the act, omission, or failure of such research facility, dealer, exhibitor, licensee, operator of an auction sale, intermediate handler, or carrier as well as of such person."

76. That upon visits by the Plaintiffs in the past months to the offices of Lawrence Cunnick, it was observed that his BIOCON business benefits from the use of animals for laboratory testing for various scientific projects. There are numerous books and other written nomenclature attesting to the procedures for the testing of animals for these laboratory procedures which are in several rooms of his offices. At the time of these visits, the Plaintiffs noted these books and inquired how Lawrence Cunnick could own a laboratory for animal testing, and a kennel which supposedly cared for, groomed, and pampered the pets of the consumer public.

77. That the conference room and other offices verifies that THE COUNTRY KENNEL, INC., et al, and BIOCON, INC., et al, both being at the same address, sharing the same offices and facilities provides that the two companies are commingled, and the actions of one entity are the result of the actions of the other entity.

> . . .*due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds. As the Tenth Circuit noted, to rule otherwise would defeat the very purpose of the money laundering statutes. It is unnecessary to attempt to segregate in some manner the tainted funds from the commingled account.*[16]

78. That Plaintiffs assert that this Complaint relies upon their incurred direct injuries and damages from the Defendants' pattern of racketeering activities which encompassed violations of the statutes pertaining to Title 7 U.S.C.A.—AGRICULTURE, and the Civil RICO statutes as defined under Title 18 U.S.C.A. § 1961 (Definitions) and § 1956 (c)(7) (Laundering

---

[16] *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994), cert. Denied, 115 S.Ct. 1699 (1995). See also, *United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996) (follows *Garcia*).

of monetary instruments).[17] The indirect injuries and damages are incorporated to support, clarify, and substantiate the Plaintiffs' claims of the direct injuries and damages.

79. That Plaintiffs have reason to believe that the animals have been used for this testing without their permission for an unknown amount of time because of the condition of the animals the last time that they saw them.[18]

80. That since the Defendants have violated these laws of the United States, the Plaintiffs assert that there is probable cause that other laws such as the 'PET ANIMAL WELFARE STATUTE OF 2005' (H.R.2669 IH and S.1139 IS) May 26, 2005, have been violated and if the records for the owners' animals are not recovered then Section 3, 4, and 5 are relevant to the violations of this law and THE COUNTRY KENNEL, INC., et al, and all entities should have their licenses suspended immediately and injunctions applied pursuant to Title 7 U.S.C.A. § 2159.

81. That the 'PET SAFETY AND PROTECTION ACT OF 2005' (S. 451 IS) February 17, 2005, which is cited a Title 7 U.S.C.A. § 2137, has been violated by obtaining the animals from the owners under false pretenses in violation of Section 7(b)(d) (Sources of Dogs and Cats for Research Facilities).

---

[17] *Holmes v Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed. 532 (1992).
[18] **Title 7 U.S.C.A. § 2145. Consultation and cooperation with Federal, State, and local governmental bodies by Secretary of Agriculture.**
(a) *"The Secretary shall consult and cooperate with to her Federal departments, agencies, or instrumentalities concerned with the welfare of animals used for research, experimentation or exhibition, or administration of statutes regulating the transportation in commerce or handling in connection therewith of any animals when establishing standards pursuant to section 2143 of this title and in carrying out the purposes of this chapter. The Secretary shall consult with the Secretary of Health and Human Services prior to issuance of regulations. Before promulgating any standard governing the air transportation and handling in connection therewith, of animals, the Secretary shall consult with the Secretary of Transportation who shall have the authority to disapprove any such consultation, that changes in its provisions are necessary in the interest of flight safety. . . . . "*

82. Therefore, the Plaintiffs state that the Defendants purposely sent this demand notice attached without previous warning with the express intention of stealing the Plaintiffs' dogs through theft by conversion to be used in laboratory experiments of dubious consequences and inhumane treatment.

83. That the Plaintiffs state that the Country Kennels is a mechanism for obtaining animals for laboratory testing without the pet owners' permission when the animals are boarded for even short amounts of time, and this process is used to obtain these laboratory animals at no expense of the owners of these laboratories. COUNTRY KENNELS is an institution organized and fraudulently managed under false pretenses for these experiments.

84. That the Plaintiffs will alert the media immediately of their allegations as to the probable causes so cited heretofore, and which will be substantially evidenced in the forth coming complaint so that others so similarly situated can take precautions for their beloved pets.

85. That the Plaintiffs have informed the HUMANE SOCIETY OF THE UNITED STATES (HSUS), PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS (PETA), and the AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS (ASPCA) of the Defendants' kennels and laboratories which are so closely connected and which should immediately be shut down pending the thorough investigation of these facilities and their financial, physical, and employee involvement in actions which are detrimental to the lives of the animals which are brought there under innocent assumptions for care; and  for the very real possibility that this kennel is using these animals for laboratory experiments while they pets are being boarded and groomed there.

86.    That it does not matter if Defendants advertise that they sell rats and mice as laboratory animals; once the concept is in place to harm any animal for testing then it is very easy for these animal cruelty people to justify to themselves the use of a dog for a few dollars more.

## VI.  OVERT ACTS

87.    That an "overt" act is open evidence of an intended crime, and a conspiracy is defined as a combination for a forbidden purpose and no "overt" act is required for conviction.[19] However, in this case the intention of the conspiracy has been confirmed by the manifest overt acts and those acts have resulted in other crimes the result of which is the intentionally inflicted pain and anguish of the Plaintiffs. Whether the intent of conspiracy is a manifestation by written or verbal words, or is carried out through conduct of the actors, it is an act and is sufficient to complete the crime.

88.    That under Title 18 U.S.C. § 1962 (d), the majority of the courts agree that a person associated with a defendant in a RICO enterprise need not herself be personally or directly involved in the commission of the predicate acts as long as that person agrees to the commission of those predicate acts by another person, or benefits from the commission of those acts.

89.    That Plaintiffs assert that the Defendant enterprises have interfered with and injured the interstate and foreign commerce of the Plaintiffs' corporations and it does not matter if the intended victims "are gullible or skeptical, dull or bright." *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980).

---

[19] "It is true that the conspiracy, the unlawful combination, has been said to be the crime, and that at common law it was not necessary to aver or prove an overt act; . . ." *Hyde v. United States*, 225 U.S. 37, 32 S.Ct. 793, 799 (1912).

90. That the Defendants did conduct and participate through trickery and deception in an attempt to acquire control of the Plaintiffs' business through a pattern of racketeering activity by falsifying and intending to falsify information to Government agencies departments, most specifically the Department of Agriculture, the National Institute of Health, and United States Naval Medical Research Institute, all headquartered in Washington, D.C. under the offices of the Executive Branch, in order to collect an unlawful debt from the Plaintiffs in violation of Title 18 U.S.C. § 1962 (c).[20]

91. That the Defendants did commit numerous acts which were criminal in nature and violations of racketeering acts during the course of fifteen months specifically through use of the mail and wire to various private and public businesses. First, the Plaintiffs' Complaint not only meets but exceeds the requirements to state the claims to establish a "pattern of racketeering activities," and the precedents are evidenced in *Yellow Bus Lines, Inc. v. Helpers Local Union 639,* 913 F.2d 948, 954 (DC Cir. 1990), which determined that a single incident could qualify a complaint for a "pattern of racketeering activities" and said complaint could be prosecuted for the violations of the RICO statutes. [21]

___

[20]  The House and Senate Reports accompanying RICO expressly stated that § 1962 (c)'s prohibitions are without limitation or exception. See Organized Crime Control Act of 1969, S Rep No. 617, 91st Congress, 1st Sess. 159 (§ 1962 (c) applies to any "conduct of the enterprise through the prohibited pattern;" "there is no limitation on the prohibition"); HR Rep No 1549, 91st Cong., 2d Sess. 4033 (1970). In Russello, 464 U.S. at 21-22, the Supreme Court termed "participate" and other RICO definitions "concepts of breadth." In Haroco, 747 F.2d 384, 398 the Seventh Circuit noted that § 1962 (c)'s "conduct" and "participate" elements are "broad terms which would defy judicial confinement.
[21]  "Conduct" is synonymous with "management" or "direction." Webster's Third New International Dictionary 473 (1961). The "conduct of [the enterprise's] affairs" thus connotes more than just some relationship to the enterprise's activity; the phrase refers to the guidance, management, direction or other exercise of control over the course of the enterprise's activities. In order to participate in the conduct of an enterprise's affairs, then, a person must participate, to some extent, in "running the show." Furthermore:
We note that our construction of the statute does allow for participation in the conduct of an enterprise's affairs by "outsiders" as well as "insiders." Section 1962 (c) provides that participation may be indirect as well as direct, 18 U.S.C. § 1962 (c), and nothing in our interpretation of the participation

92. That this most important case, *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* occurred in 1988 in which the District of Columbia Circuit addressed the RICO pattern issue.[22] The case concerned a four-day strike by employees of the plaintiff company which involved four predicate acts of extortion through acts of sabotage to obtain concessions.

93. That the case went to the Court of Appeals where it was upheld that the defendants were *"accused of engaging in acts of vandalism and intimidation during a specific time period in pursuit of a unitary goal."*[23] The Supreme Court vacated the opinion and remanded the case for consideration because of the *H.J., Inc. v. Northwestern Bell Tel Co.* decision. The Court of Appeals then reaffirmed their earlier decision stating that despite the strike's short span, the alleged acts could prove and could establish *"a distinct threat of long-term racketeering activity, either explicit of implied."*[24]

94. That the Plaintiffs' Complaint not only meets the criteria for the interpretation of established law in this circuit, it meets the criteria for the majority of the other circuits, and, particularly, the Supreme Court of the United States.[25]

---

requirement precludes liability on the part of outsiders. The crucial question is not whether a person is an insider or an outsider, but whether and to what extent that person controls the course of the enterprise's business. *Yellow Bus Lines, Inc. v. Local Union 639,* 913 F.2d 948, 954 (DC Cir. 1990).

[22]    839 F.2d 782 (D.C. Cir. 1989), *vacated and remanded,* 109 S.Ct. 3235 (1989), *on remand,* 883 F.2d132 (D.C. 1989).

[23]    839 F.2d at 789, 883 F.2d at 139.

[24]    883 F.2d at 1455 (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. 2893, 2903).

[25]    *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 30-31 (1st Cir.1987) (rejecting multiple scheme requirement; sufficient that predicates relate to one another and threaten to be more than an isolated occurrence); *United States v. Indelicato,* 865 F.2d 1370, 1381-1384 (2d Cir. 1989) (in banc)(rejecting multiple scheme requirement; two or more interrelated acts with showing of continuity or threat of continuity sufficient); *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39-40 (3d Cir. 1987) ( rejecting multiple scheme requirement; adopting case-by case multifactor test); *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154-155 (4th Cir. 1987) (rejecting any mechanical test; single limited scheme insufficient, but a large continuous scheme should not escape RICO's enhanced

95. That the overt acts in this Complaint was the meeting of the minds of the Defendants in various acts, and through various enterprises with separate groups of actors, to complete the conspiracy. Each enterprise saw the opportunity to support its own goals by committing these crimes against the Plaintiffs. It is *"elementary that a conspiracy to commit a crime may be punished even though the crime be not committed."* [26]

96. That the Defendants devised the various aspects of sending not one, but three letters of statutory extortion which were signed by two different Defendants. The third letter from Defendant Michael Ebaugh would have stood separately as just a threatening harassment letter if the other two letters of extortion had not proceeded it.

97. That Defendants Michael Ebaugh and Donald R. Rodgers knew that the unlawful confinement of the Plaintiffs' dogs amounted to a kidnapping of the property   for the purpose of obtaining money, means, property or thing of value as a ransom, reward or price for the return of the animals yet they did not discourage the other Defendants from proceeding with the conspiracy and criminal  intent which violate the laws of the United States. When Defendants Ebaugh and Rodgers failed to do their duty to discourage the violation of the laws they committed another  overt act and set up their own RICO enterprise to obtain portions of the ransom money from the other Defendants.

---

penalties); *R.A.G.S. Couture, Inc. v. Hyatt, 774* F.2d 1350, 1355 (5th Cir. 1985) (two related predicate acts may be sufficient); *United Stated v. Jennings, 842* F.2d 159, 163  (6th  Cir. 1988) (two predicate acts potentially enough); *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975-76 (7th Cir. 1986) (refusing to accept multiple scheme requirement as the general rule); *Sun Sav. & Loan Ass'n v. Dierdorff,* 825 F.2d 187, 193 (9th Cir. 1987) (rejecting multiple scheme test; requiring two predicates, separated in time and which are not isolated events); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir. 1986) (rejecting multiple scheme test; requiring that  predicates be interrelated and not isolated events); *Yellow Bus Lines, Inc. v. Drivers, Chaufffeurs & Helpers Local Union 639,* 839 F.2d 782 (D.C. Cir. 1988) ( requiring  related acts that are not isolated events).
[26] *Frankfeld v. United States,* 198 F.2d 679, 684 (4th Cir. 1952).

98. That a Defendant is guilty of the crime of kidnapping for ransom if he participates in *any* of the three elements of the offence:

1) the unlawful seizure, 2) the secret confinement, or 3) the extortion of the ransom.

99. This includes one who acts as a go-between to collect the ransom for the actual abductors.[27] Not only do these Defendants Michael T. Ebaugh and Donald R. Rodgers know of the kidnapping and ransom, they also know that some of the animals will be illegally used for laboratory testing without the consent of the rightful owners.

100. That the Plaintiffs sent a 'Notice of Intent to Sue' to the Defendants on December 19, 2005, demanding to know what the charges entailed, and the result was the letter sent by Defendant Michael T. Ebaugh on January 5, 2006. ('Exhibit D')[28] A copy of this letter is attached to this Complaint as 'Exhibit D' and incorporated by reference herein).

101. That Defendant Michael T. Ebaugh did not dismiss or deny the fact that the previous two letters sent by Defendant Pamela Neidermair were extortion demands, but joined her and Lawrence E. Cunnick in a continuation of the conspiracy by establishing a new RICO

---

[27] *People v. Petitti*, 337 Ill. 625, 169 N.E. 749 (1929), Holmes, J.
[28] "Therefore, if the pleadings place Defendant on notice of the precise misconduct or fraudulent acts claimed, as an alternative to pleading the time, date and places of the wire and fraud violations, Rule 9(b) is satisfied." *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49, 76 (S.D.Ohio 1986). See also *Spira v. Nick*, 876 F. Supp. 553 (S.D.N.Y. 1995) (once Plaintiff alleges with particularly the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.); *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992) (complaint need not specify the time, place, and contents of each mail communication where the nature and mechanics of the underlying scheme are sufficiently detail. *Supra*, Baptista, pg. 297, note 14.

enterprise to extort even more money through other criminal acts with Defendant Donald R. Rodgers.[29]

> "Criminal intent" is an intent to do that which constitutes a violation of the law and does not necessarily involve an intent to violate the law. Hence ignorance of the illegal nature of the act does not preclude the possibility of a criminal intent. *State v. Armington*, 25 Minn. 29 (1878).

102.   That if the letters had been sent as a legitimate collection notice from a creditor then there would have been not only monthly or quarterly statements, but an explanation for the charges demanded. None of the Defendants has ever answered or addressed the simple issues of what the demands for money in those letters entailed. The Defendants' failure to explicitly detail the specific charges that they demanded only intensified and affirmed the Plaintiffs' truthful allegation that the missives were nothing more than ransom or blackmail letters.[30]

103.   That the Plaintiffs will confirm these allegations with testimony at trial from evidentiary materials which have been gathered by their investigators who were immediately retained on December 17, 2005.

## VII.  RESTRAINT OF TRADE PURSUANT TO TITLE 18 U.S.C. § 1962 (a) AND (b)

104.   That the predicate acts of mail fraud committed by the Defendants were a direct interference with Plaintiffs' interstate and foreign commerce by harming, and thus preventing the  Plaintiffs, from their work because they were so distraught with the actions of the Defendants that they were  obligated to take time to address the situation of the dogs threatened demise, initiate time consuming damage control,  and delay consummating agreements for normal business plans.

---

[29] *A result is intended if it is contemplated as a probable consequence, whether it is desired or not.* 1 Austin, Jurisprudence 424 (5th ed. 1885).
[30]  An intent may be inferred from "a reckless disregard for the safety of others." *Luther v. State,* 177 Ind. 619m 625, 98 N.E. 640, 642 (1912).

105.   That RICO requires a specified relationship between the RICO defendant and enterprise. Either the enterprise must be the object or goal of the racketeering activity (§§ 1962(a) and (b)), or it must be a tool utilized to carry out racketeering activity. *Benard v. Hoff*, 727 F. Supp 211, 214 (D MD 1989).

106.   That the individual Defendants Lawrence E. Cunnick, Pamela Neidermair, Michael T. Ebaugh and Donald R. Rodgers used the various enterprises that they have formed either jointly or separately as the tools by which to attempt to destroy the Plaintiffs' lives and thus their business by attempting to collect an unlawful debt in the guise of a 'claim for an undefined debt.'

> "primary purpose of RICO. . .[which] is to reach those who ultimately profit from racketeering, not those who are victimized by it." *Haroco, Inc. v. American Natl Bank & Trust*, 747 f2d 384, 401 (7th Cir 1984), *affd on other grounds*, 471 U.S. 606 1985).

107.   That the restraint of trade was  produced by the Defendants' violations of the contractual agreements and  the violation of the statute laws of the United States. The Plaintiffs lost personal income because the Defendants caused the delay of business opportunities for the Plaintiffs' company that were being planned and  promised contracts.[31]

108.   That  Plaintiffs maintain that the scheme was not readily revealed and  remained that way until after all of the transactions were completed. [32]

## VIII.  RESPONDEAT  SUPERIOR

---

[31] RICO and the  federal antitrust statutes are well integrated because "[t]here are three possible kinds of force which a firm can resort to: violence, (or threat of it), deception, or market power." C. Kaysen & D. Turner, Antitrust Policy 17 (1959), as quoted in RICO in Business and Commercial Litigation, by Kevin P. Roddy.

[32] "defendant  actively misled her, and that she had neither actual not constructive knowledge of the facts constitutes [the] cause of action despite her due diligence." *Grimmett v. Brown,* 75 F.3d 506, 514.

109. That Defendants THE COUNTRY KENNEL, INC., BIOCON, INC., Michael T. Ebaugh and Donald R. Rodgers committed predicate and overt acts which they conspired and acted upon in concert with and under the direction of Defendant Lawrence E. Cunnick and Pamela Neidermair in the continuation of the pattern of racketeering activities.[33]

110. That Defendant Lawrence E. Cunnick is the *respondeat superior* who knew and directed the actions of the other Defendants and their enterprises to commit these acts against the Plaintiffs pursuant to Title 18 U.S.C. § 1956(c)(7)(D), (Relating to the laundering of monetary transactions in property derived from unlawful activity), and § 1962 (a)(b) and (d) (Prohibited activities).[34]

111. That *respondeat superior* has been defined as follows:

1. Under *respondeat superior*, employer is liable for acts that employee performed within scope of employment as long as servant's acts were intended at least in part, to serve master; thus, servant need not be action for exclusive benefit of principal for liability to attach, as it is enough that agent intended his acts to produce some benefit to himself and to principal.

3. Under *respondeat superior*, employer is liable for acts that employee performed within scope of employment as long as servant's acts were intended at least in part, to serve master; thus, servant need not be acting for exclusive benefit of principal for liability to attach, as it is enough that agent intended his acts to produce some benefit to himself and to principal.

---

[33] "lower-rung participants . . . who are under the direction of upper management" may implement decisions as well as participate in the conduct of an enterprise. *United States v. Oreto*, 37 F.3d 739 (1ˢᵗ Cir 1994), cert. denied, 115 S.Ct. 1161, 130 L.Ed. 2d 1116 (1995). CIVIL RICO PRACTICE MANUAL, Second Edition, by Paul A. Baptista, Wiley Law Publications, John Wiley & Sons, Inc., (1997), pg. 81.

[34] It is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high level has been determined, the court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefited from the racketeering activity. *Gruber v. Prudential-Bache Secs., Inc.*, 679 F.Supp. 165, 181 (D.Conn. 1987).